IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. 19-CV-03555-GPG

REBEKAH CARTER,

    Plaintiff,

v.

TYRA MONGER,

    Defendant.

---

**OPINION AND ORDER (1) DENYING DEFENDANT'S MOTION TO EXCLUDE SELECT TESTIMONY AND (2) GRANTING PLAINTIFF'S MOTION TO LIMIT EXPERT TESTIMONY**

---

This matter comes before the Court on Defendant's motion to exclude select testimony of Jacquelyn N. Morris, RN, CRRN, CNLCP, under Federal Rule of Evidence 702 (D. 48)[1], Plaintiff's response (D. 51), and Defendant's reply (D. 53). Also before this Court is Plaintiff's motion to limit the testimony of Hal Wortzel, MD (D. 52), Defendant's response (D. 56), and Plaintiff's reply (D. 58). The Court has reviewed the pending motions, responses, replies, and all attachments. The Court has also considered the entire case file, the applicable law, and is sufficiently advised in the premises. Oral argument is not necessary. This Court DENIES Defendant's motion to exclude select expert testimony of Morris and GRANTS Plaintiff's motion to limit the expert testimony of Dr. Wortzel for the reasons specifically set forth below.

---

[1] "(D. 48)" is an example of the stylistic convention used to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

I.   FACTS

This Court is satisfied that jurisdiction is conferred upon this Court under 28 U.S.C. § 1332 because diversity exists between Plaintiff and Defendant, as they are citizens of different states, and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1).  Because this case arises under diversity jurisdiction, this Court applies state substantive law and federal procedural law.  *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017); *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

This action arises from a vehicular accident between Plaintiff's motorcycle and Defendant's truck in Grand Junction on September 13, 2017.  (D. 1, p. 2).  Plaintiff alleges that she sustained injuries, damages, and losses as a result of the accident and raises three claims for relief:  (1) negligence; (2) negligence per se, in violation of Colorado Revised Statute § 42-4-1402; and (3) negligence per se, in violation of Colorado Revised Statute § 42-4-702.  (*Id.*, pp. 3-6).  Plaintiff retained Jacquelyn Morris, RN, CRRN, CNLCP as an expert in life care planning and nursing.  (D. 48-5, p. 1).  Defendant has retained Hal S. Wortzel, MD as an expert in the fields of neuropsychiatry and behavioral neurology.  (D. 56, p. 1).  Each party objects to the other's retained expert and portions of the expert's report.

II.   LEGAL STANDARD

Federal Rule of Evidence 702 permits:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

>   (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  An expert must be qualified based upon knowledge, skill, experience, training, or education to testify in the form of an opinion in a particular subject area.  *Id.*

The district court has a general gatekeeping obligation that applies not only to testimony based on scientific knowledge but to all expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  To perform that gatekeeper function, a court must perform a two-step analysis:  (1) the court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion, and (2) if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable under the principles set forth in *Daubert*, i.e., whether the proposed testimony is sufficiently relevant.  *103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006).  Where an expert witness relies on experience in stating opinions, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (citation omitted).

The court has "broad discretion" in "deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003).  The party offering the expert opinion bears the burden of establishing its admissibility, including the foundational requirements by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).  The proponent does not need to prove that "the opinion is objectively correct"; rather, the proponent must prove that "the witness has sufficient expertise to choose and

3

apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008)

If the standard for reliability is met, the Court must then ensure that the proffered testimony will be of assistance to the trier of fact. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006). "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). Finally, a court may exclude relevant evidence under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

III. ANALYSIS

A. Jacquelyn Morris, RN, CRRN, CNLCP

On October 30, 2020, Plaintiff served her expert disclosures, which included Morris as an expert in life care planning and nursing. (D. 48-1, pp. 1-2). Morris's report, prepared in December 2018, noted that

> [the life care plan is] a comprehensive projection of current and future medical costs based on the specific needs of Mrs. Carter. It is an estimate of medical care and costs that may require modification as the life situation changes. Updating is required as the individual's health status changes. It is recommended the preliminary Life Care Plan should be reviewed and updated by the author as the client's needs change.

(D. 48-6, p. 1). Morris evaluated and summarized Plaintiff's medical history and treatments after the accident, noting in particular that Plaintiff has been diagnosed with a vision diagnosis and has

4

experienced balance and hearing deficits since the September 2017 motor vehicle accident. (*Id.*, pp. 2-10). Morris calculated that the normal life expectancy for a forty-nine-year-old female is thirty-four years, based on the U.S. Life Tables, National Vital Statistics Reports. (*Id.*, p. 9). This normal life expectancy was used to determine lifetime costs of, among other things, medication and medical care. (*See id.*, pp. 12-21).

On October 29, 2020, Morris submitted an addendum to the life care plan, wherein Morris reviewed a psychological report from Dr. Timothy Shea, Psy.D., and added his recommendations to the plan in addition to a new medication Plaintiff was recently prescribed for her migraine headaches. (D. 48-1). According to the report, Plaintiff's new medical costs totaled $1,530.74 per year and $45,922.07 for her lifetime; new medication for migraines (Emgality or galcanezumab-gnlm) was updated to $8,640.00 per year and $259,200.00 for her lifetime; and a total life care plan cost of $10,847.43 per year and $325,422.90 for her lifetime. (*Id.*, pp. 1-2).

Defendant argues that Plaintiff had a medical history of headaches that date back to at least March 2009 and was prescribed other medications to treat them. (D. 48, p. 2). Defendant seeks to exclude the information regarding Emgality under Rule 702 because Morris is not qualified to offer an opinion on this and her opinion on Emgality is not reliable. (*Id.*).

1. Qualifications

Defendant does not challenge the qualifications of Morris in general, but merely as it applies to Morris's qualifications to opine on Plaintiff's need for Emgality or the duration of Plaintiff's purported need. Morris has a Bachelor of Science in Nursing and is a Registered Nurse, licensed in Kansas and Wisconsin. (D. 48-8, p. 1). Morris has maintained her certification as a Certified Nurse Life Care Planner with the American Association of Nurse Life Care Planners since 2005 while working at Godlove-Morris & Associates, LLC. (*Id.*).

The role of a life care planner is to review the reports, records, and opinions of other experts and treating physicians and condense that information into a comprehensive plan. *See Feliciano v. Cate St. Cap., Inc.*, No. 2:13-CV-OO162-SWS, 2014 WL 7642091, at *2 (D. Wyo. Sept. 17, 2014) ("A life care planner is an assimilation expert in that he or she reviews the records and opinions of medical experts and assimilates that information into a summary of future medical and rehabilitation care and its related expenses for the jury."). Typically, a life care planner bases his or her opinion on the conclusions of treating physicians and other professionals. *See Kilcrease v. T.W.E., L.T.D.*, No. 03-1013-MLB, 2004 WL 5509089, at *1 (D. Kan. May 18, 2004). In the field of expertise of life care planning, the life care planner can and must rely on the reports of others. *Booth v. Kit, Inc.*, No. CIV. 06-1219 JP/KBM, 2009 WL 4263615, at *2 (D.N.M. Mar. 9, 2009). Morris estimated the costs of future treatments and prescription medication based on billing records and the pricing information from Walmart, CVS, and Walgreens (www.goodrx.com for Rodger, Arkansas) and averaged the amount for a total cost of $720.00/ month. (D. 48-1).

This Court finds that Morris's opinions regarding the nature and extent of Plaintiff's disabilities are based on the opinions and prescriptions of treating physicians. In conjunction with Morris's experience and education, she is qualified to testify as an expert for the purpose of estimating future medical costs and medication, which includes Emgality. *See Graham v. State Farm Mut. Auto. Ins. Co.*, No. 19-CV-00920-REB-NYW, 2020 WL 9172034, at *3 (D. Colo. Sept. 30, 2020). Because Defendant does not challenge Morris's qualifications as a life care planner in general, this Court does not need to delve further into this analysis.

2. Reliability

Defendant next argues that Morris's opinion regarding Emgality is not based on sufficient facts or data, and therefore it is unreliable under Rule 702. (D. 48, pp. 8-9). Specifically,

6

Defendant argues that Morris has not relied upon any reliable methodology for her opinion and merely:

> speculates that Plaintiff will need monthly injections of Emgality for the next thirty years. Ms. Morris's Emgality Opinion is not based on the consideration of any facts or data, but rather apparently a single telephone call with Plaintiff in which she relayed that Dr. Jennings had initiated a prescription for Emgality.

(*Id.*, p. 9). Defendant argues that Morris's opinion is inadmissible speculation and cites *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) for the proposition that the district court must determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." But the report issued by Morris is "simply an estimate, from which the jury is permitted to draw its own conclusion about [Plaintiff's] future medical costs." *Sands v. Kawasaki Motors Corp. U.S.A.*, 513 F. App'x 847, 856 (11th Cir. 2013). It is conceivable that the jury might increase or decrease "the amount for future medical costs given the quantity and breadth of [Plaintiff's] future needs, combined with the lifetime nature of her injuries." *Id.*; *see also Lesch v. United States*, 612 F.3d 975, 983 (8th Cir. 2010) ("[T]he burden of proof was on the plaintiff to prove the damages, and, [a]s such, the [factfinder] could believe or disbelieve all or any part of the evidence supporting the plaintiffs' alleged damages.") (internal quotations and citation omitted).

Defendant argues that Morris has not shown that she has done any research to support the conclusion that Plaintiff will need this medication for life. (D. 53, p. 3). However, this argument goes to the weight of the opinion, not its admissibility. The District of Colorado has previously noted that:

> the Court does not examine whether the facts obtained by the witness are themselves reliable—whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion. Rather, the inquiry examines only whether the witness obtained the amount of data that the methodology itself demands.

7

*United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008).  Instead, Defendant must address this issue during the trial on cross-examination.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see Burgard v. Morales*, No. 17-CV-02537-MSK-SKC, 2020 WL 2214394, at *4 (D. Colo. May 7, 2020) ("And, of course, Mr. Morales is free to cross-examine Mr. Dahlberg to elicit whether Mr. Dahlberg has any independent basis to believe the accuracy of Mr. Pickering's estimates, or even to call Mr. Pickering himself and examine him about the accuracy and reliability of his statements to Mr. Dahlberg."); *Blair v. Samardjich*, No. CV202-114, 2003 WL 25764890, at *1 (S.D. Ga. Sept. 23, 2003) ("[A]ny failure by Butler to rely on the relevant evidence in making her assessment is something that can be addressed by Defendant on cross-examination.").  Accordingly, this Court DENIES Defendant's motion.

    B.  Hal Wortzel, MD

Defendant has retained Dr. Wortzel as an expert.  In September 2020, Plaintiff underwent a neuropsychiatric examination.  (D. 52-1, p. 1).  Plaintiff raises three objections to Dr. Wortzel's report and possible testimony:  (1) referencing redactions in Plaintiff's medical record; (2) opining on Plaintiff's truthfulness; and (3) opining on Plaintiff's financial motivations for filing suit and speculating about Plaintiff's symptoms.  (D. 52, p. 2).  Plaintiff does not contest Dr. Wortzel's qualifications, thus this Court will not address this issue.

    1.  Physician-Patient Privilege

Plaintiff notes specific instances where Dr. Wortzel remarks on redactions within Plaintiff's medical record:

> 1. "Records would again appear to be notable for some substantial redacted content."
> 2. "There would appear to be considerable redacted content."
> 3. "Follow-up documentation from November 2, 2016 is notable for redacted content."

(D. 52-1, pp. 13-15). This Court notes that there are various other places in the report where Dr. Wortzel comments on the redactions in the report, e.g., "Assessment is notable for the #1 diagnosis being redacted." (*Id.*, p. 15). Put simply, it is inappropriate for Dr. Wortzel to comment in any fashion on the redacted nature of documents he has reviewed. If Defendant had wished to challenge any redactions or assertions of the physician-patient privilege, the proper forum for such a dispute would have been before this Court regarding whether the privilege was properly asserted. Defendant has not moved for Plaintiff to produce an unredacted version and may have presumably forgone such an option. *See Hutchison v. Walmart, Inc.*, No. 1:19-CV-01496-SKC, 2020 WL 9075064, at *1 (D. Colo. Oct. 29, 2020). Such commentary regarding redactions would be misleading to the jury and in violation of Rule 403. *See Jamison v. Depositors Ins. Co.*, No. 4:14-CV-3009, 2016 WL 4443873, at *3 (D. Neb. Aug. 22, 2016).

However, this Court distinguishes redactions from missing data or information. For example, Dr. Wortzel is free to note if there is a gap in Plaintiff's medical history:

> 1. "[C]ontemporaneous medical records are devoid of any content to suggest alteration in consciousness, loss of consciousness, or any requisite criteria for [traumatic brain injury (TBI)]" or
> 2. "There is then a paucity of records for nearly 2 years during which Ms. Carter has sought/received little in the way of ongoing evaluation or treatment."

(D. 52-1, pp. 22, 31). Dr. Wortzel may note if there is a gap in Plaintiff's medical history (i.e., Plaintiff did not seek treatment or delayed seeking treatment), but he may not comment on specific redactions due to the assertion of a privilege. *See Hutchison v. Walmart, Inc.*, No. 1:19-CV-01496-SKC, 2020 WL 9720412, at *1 (D. Colo. Nov. 3, 2020).

      2. Truthfulness

Plaintiff next seeks to limit Dr. Wortzel's comments on Plaintiff's credibility within his report. The report has numerous references in it, but the Court will highlight a few:

1. "In short though, records and the present examination reveal a remarkable evolution of illness that defies the applicable natural history for mild TBI. That evolving illness is now accompanied by a *remarkable evolution in narrative*."
2. "Subsequently though, Ms. Carter gravitates towards some evaluators that feature with regularity in mild TBI litigation, and *in that setting we see a rather remarkable evolution in both illness and narrative*."
3. "But it also would appear to be the case that those evaluators are predominantly relying upon Ms. Carter's self-reported history, *which is notable now for a rather remarkable evolution in narrative*."
4. "Ms. Carter offers *a rather remarkable narrative . . .*"
5. "In turn, Ms. Carter apparently elected to not share that information with emergency room evaluators, and EMTs once again purportedly neglected to pass along such information. Given the remarkably benign circumstances featuring across both EMS documentation and emergency room documentation, *as well as a remarkable evolution in illness that is* grossly incompatible with the natural history for mild TBI, *and all occurring in the context of mild TBI litigation, it is difficult to not experience this narrative as a rather incredulous one*."
6. "Alternative explanations for persisting (or escalating) symptoms in the wake of a possible mild TBI may span a wide differential including (but not limited to) things such as depression, anxiety, PTSD, medication effects, substance abuse, disrupted sleep, chronic pain, and a spectrum involving somatization, factitious symptoms, *and/or malingering. In considering the issue of malingering, it is worth noting that base rates of such are high in the context of brain injury litigation, with some authors reporting rates nearly as high as 40%.*"

(D. 52-1, pp. 22, 25, 27, 28, 31-32) (emphasis added).

"The credibility of witnesses is generally not an appropriate subject for expert testimony" in large part because it "usurps a critical function of the jury," is generally unhelpful to the factfinder, or is highly prejudicial and unduly influences the jury. *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993). Most importantly, an expert opining on the credibility of an individual violates Rule 702 because "the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) (internal quotations and citation

omitted). There are a limited number of circumstances where credibility testimony by an expert may be appropriate. *Adams*, 271 at 1246 (finding that the district court did not abuse its discretion in admitting testimony from a treating psychologist to explain the defendant's conflicting statements to law enforcement); *see also Gould v. Union Pac. R.R. Co.*, No. 19-CV-02326-PAB-NRN, 2021 WL 4428286, at *7 (D. Colo. Sept. 27, 2021) (where the District Court permitted Dr. Wortzel to opine about malingering because Dr. Wortzel had shown that malingering is a neurological diagnosis under the Diagnostic and Statistical Manual of Mental Disorders and that it applied to the plaintiff who was injured after rocks fell from a train track above the plaintiff's car and struck her through the sunroof).

Like *Gould*, here this Court will permit Dr. Wortzel to "opine on [P]laintiff's medical diagnoses, whether the claimed accident could cause plaintiff's injuries, and whether the medical record supports plaintiff's claimed injuries." *Gould*, 2021 WL 4428286, at *7. However, unlike *Gould,* Dr. Wortzel does not reference the Diagnostic and Statistical Manual of Mental Disorders (DSM) when discussing Plaintiff's alleged malingering nor does his neurological assessment of Plaintiff officially conclude that Plaintiff is malingering, but only suggests it as a possibility.[2] As the Court in *Gould* noted:

> Malingering is the exaggeration of symptoms as a result of external factors . . . [and] is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives . . . In other words, malingering *is a psychiatric diagnosis* that may be reached when the objective medical evidence does not support claimed symptoms.

*Id.* (quoting Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 726-27 (5th ed. 2013)) (emphasis added).

---

[2] This Court notes that Dr. Wortzel does reference the DSM when describing the natural history of mild TBI. (D. 52-1, p. 30). When discussing malingering, Dr. Wortzel references J Mark Melhorn et al., *AMA Guide to the Evaluation of Disease and Injury Causation* 509 (2nd ed. 2014) but does not rely upon the text to diagnose Plaintiff with malingering. (*Id.*, p. 32). Rather, Dr. Wortzel describes Plaintiff's narrative as "all the more suspect." (*Id.*, p. 33). This is commentary, not a diagnosis.

11

Here, however, Dr. Wortzel did not diagnose Plaintiff with malingering nor rule out that Plaintiff's medical issues were not in keeping with the physical evidence documented by her treating physicians. *See, e.g., Scaggs v. Consol. Rail Corp.*, 6 F.3d 1290, 1292 (7th Cir. 1993) ("[C]omplaints of pain were not in keeping with the physical evidence demonstrated by the tests."). Rather Dr. Wortzel says that Plaintiff's narrative is "all the more suspect." Without a psychiatric diagnosis by Dr. Wortzel, this Court will not permit such testimony as such theorizing violates Rule 702 and 403. *Hutchison*, 2020 WL 9075064, at *4. As an expert in forensic neuropsychiatry and behavioral neurology, Dr. Wortzel may opine on Plaintiff's medical history, whether the claimed accident could cause Plaintiff's injuries, and whether the medical record supports the claimed injuries.[3] Dr. Wortzel is free to conclude that there is "simply no evidence to establish any significant neuropsychiatric injury as a consequence of the accident occurring on September 13, 2017" or that the "course of illness revealed in subsequent treatment records is grossly incompatible with the natural history for mild TBI."

Dr. Wortzel cannot conclude, however, that Plaintiff is malingering, that Plaintiff's narrative is a "rather remarkable evolution in narrative[4]," or that Plaintiff's narrative is "a rather incredulous one" or "suspect" if he is unable or unwilling to make a psychiatric diagnosis of malingering after conducting a mental status examination and neurobehavioral status examination of Plaintiff. None of these statements are relevant or helpful to the factfinder. Furthermore, if the Court were to permit Dr. Wortzel to make such statements (especially without an official

---

[3] Dr. Wortzel also comments, inappropriately, on his frequency of interaction with Dr. [Chris] Young in the context of mild TBI litigation, labeling Dr. Young's practices as "idiosyncratic." (D. 52-1, p. 6). This is unduly prejudicial under Rule 403 and will not be allowed. Should Dr. Young be tendered as an expert by the opposing party, the jury is charged with determining his credibility and the weight to be given to his expert opinions—not Dr. Wortzel. The Court would determine any challenge to the reliability of his methods (and none has been interposed)—not Dr. Wortzel. Dr. Wortzel may also not comment or speculate as to what medical records or literature were reviewed by Dr. Young if he was not a party to such actions.

[4] The Court finds Dr. Wortzel's comments about a "remarkable evolution in narrative" or an "incredulous" narrative to be problematic even if there was a diagnosis of malingering; however, given that Dr. Wortzel does not diagnose Plaintiff with malingering, this Court does not need to reach any further conclusions.

diagnosis), his testimony would be usurping the function of the factfinder and would violate Rule 702 and Rule 403.

       3. Motivation for Litigation

Finally, Plaintiff objects to Dr. Wortzel's report for commentary on Plaintiff's motivation for pursuing a lawsuit. Dr. Wortzel notes, among other things, in his report that "[t]he present medicolegal matter would appear to feature some rather remarkable claims, albeit in a fashion which is rather typical of the unfortunate state of mild TBI litigation." (D. 52-1, p. 24). Dr. Wortzel may not comment on Plaintiff's motivation for pursuing litigation or accessing the judicial system. *Caldwell v. Wal-Mart Stores, Inc.*, 229 F.3d 1162 (10th Cir. 2000) ("Absent some evidence of fraud on Caldwell's part (and none was proffered), evidence of his financial motivation to bring the suit was not relevant to any of the issues in this case."). As the Court noted in Gould,

> Dr. Wortzel may not opine on the state of mTBI litigation generally, as it is irrelevant to the case. Instead, he must confine his opinions to plaintiff's case.

*Gould*, 2021 WL 4428286, at *8. However, because Dr. Wortzel did not reach a clinical opinion or diagnosis for malingering in the instant action, he may not opine on the effect of litigation and malingering in the context of this case. Accordingly, Plaintiff's motion is GRANTED consistent with the analysis within the Order.

IV.    CONCLUSION

For the foregoing reasons, this Court DENIES Defendant's motion to exclude select testimony of Jacquelyn N. Morris, RN, CRRN, CNLCP, under Federal Rule of Evidence 702. (D. 48).

For the foregoing reasons, this Court GRANTS Plaintiff's motion to limit the testimony of Hal Wortzel, MD. (D. 52).

Dated at Grand Junction, Colorado this April 13, 2022.

_____
Gordon P. Gallagher
United States Magistrate Judge